UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Thomas Hutchinson,<br>    *Plaintiff*, | Civil No. 3:09cv1848(JBA) |
|     *v.* | |
| Ecolab, Inc.,<br>    *Defendant.* | September 27, 2011 |

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Thomas Hutchinson, brought this action against Defendant Ecolab Inc., claiming violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq.*, and violation of the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. §§ 46a-60, *et seq.* Defendant now moves [Doc. # 52] for summary judgment on both counts. For the reasons stated below, Defendant's motion will be denied.

I.      Factual Background

        A.      Plaintiff's Employment with Defendant: Undisputed Facts

        Defendant Ecolab, Inc. ("Ecolab") is a business specializing in cleaning, sanitizing, food safety and infection prevention products. (Panas Decl., Ex. A to Def.'s Loc. R. 56(a)1 Stmt. [Doc. #54] ¶ 3.)  Plaintiff Thomas Hutchinson had been employed by Ecolab since 2005 as a Route Sales Manager ("RSM"). (Berchem Mem., Ex. 1 to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. #65].)  His main job responsibility was to make sure that the customers were satisfied with Ecolab's products and that the products, including commercial dishwashers and cleaning agents, were properly used and maintained. (Panas Decl. ¶¶ 5, 7.) He was also expected to sell additional Ecolab solutions and products. (*Id.* ¶ 6.) He was not responsible for delivering products to consumers. (*Id.* ¶ 7.)

Plaintiff's job required him to drive to and personally meet with about 150 or 200 customers on a set route. (*Id.* ¶¶ 7, 9; Pl.'s Dep., Ex. E to Def.'s Loc. R. 56(a)1 Stmt. at 10:18–20.) He would travel 500 to 1,000 miles per week. (Pl.'s Dep. at 10:9–10.)  Plaintiff stated that he was on–call twenty–four hours a day and worked at least fifty–five hours per week (including travel time). (Pl.'s Dep., Ex. 2 to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 65] at 21:4–7.) Route Supervisor Jim Hainey oversaw and assisted Plaintiff and approximately five other RSMs, and Plaintiff reported to George Panas, the Area Manager. (Panas Decl. ¶¶ 2, 12.) According to Mr. Hainey, Plaintiff's work was "great" overall; Hainey enjoyed working with Plaintiff, "the customers liked him," and "[h]e knew how to do his job." (Hainey Dep., Ex. 3 to Pl.'s Loc. R. 56(a)2 Stmt. at 19:17–19.)

Defendant provides each employee an unpaid Family and Medical Leave for up to twelve weeks, as required by the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (Ecolab FML Policy, Ex. B–1 to Def.'s Loc. R. 56(a)1 Stmt.)  Unless prohibited by state law, this Family and Medical Leave runs simultaneously with any short–term disability ("STD") leave which Ecolab provides for its "disabled" employees.  The STD leave offers up to six consecutive months of full pay for a medically certified absence, regardless of an employee's FMLA eligibility.  (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs., Ex. 8 to Pl.'s Loc. R. 56(a)2 Stmt. at 11; Ecolab STD Policy, Ex. C-1 to Def.'s Loc. R. 56(a)1 Stmt. at ECO0429.) An employee is considered "disabled" and eligible for STD benefits when, as a result of injuries or illnesses not caused by war or the commission of a crime, an employee is

> Unable to perform the principal duties (essential functions) of the job position to which the associate was assigned on the date the disability began, with or without reasonable accommodation; not engaged in any occupation or employment; not working for pay or profit; and under the care or supervision of a licensed medical practitioner.

(Ecolab STD Policy at ECO0427.)  When an employee is placed on STD leave, Ecolab does not evaluate whether he is "disabled" under state or federal law, "but simply attempts to accommodate medical restrictions (the result of a disability or not) as a matter of course." (*Id.* ¶¶ 5, 9; Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 11.)

Unlike the FMLA leave, which guarantees reinstatement to the same or an "equivalent position," 29 U.S.C. § 2614(a), the STD leave does not guarantee a right to reinstatement. It states that

> Ecolab will make reasonable efforts to reinstate associates returning from Medical Leaves into a position of equal status and pay, but reemployment is not guaranteed. Reemployment is dependent upon successful recovery or rehabilitation from the disability and availability of a position.

(Ecolab STD Policy at ECO0428.) Excluding Plaintiff, twenty–three employees of Defendant have taken advantage of the STD benefits during the past three years; eighteen of them returned to the same position they held when they went on leave. (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 12–13.)  Employees who are granted medical leave for more than three days (or five days, depending on the status of the employee) are prohibited from returning to work unless they can present a return–to–work release signed by a licensed medical practitioner, or if treated by multiple physicians, by all primary providers. (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs., Ex. 9 to Pl.'s Loc. R. 56(a)2 Stmt. at 9.) For those who cannot obtain the medical authorization to return to work by the time STD benefits have been exhausted, Ecolab offers a paid Long–Term Disability benefit. (Burgess Decl., Ex. C to Def.'s Loc. R. 56(a)1 Stmt. ¶ 10)

B.      Plaintiff's Health Problems and Leave in 2008

In July 2008, Plaintiff experienced dizzy spells, memory loss, joint pain, and work–induced stress and took a leave of absence because of these conditions. (Pl.'s Dep. at 20:3–22; Pl.'s Aff., Ex. 13 to Pl.'s Loc. R. 56(a)2 Stmt. ¶ 6.) After learning about Plaintiff's leave of absence, Defendant's Human Resources Representative, Andrea Sandager, sent Plaintiff a letter on August 1 informing him about the STD policy and advising him to submit the STD paperwork within ten days. (Sandager Decl., Ex. B to Def.'s Loc. R. 56(a)1 Stmt. ¶¶ 16–18.)  Plaintiff submitted the paperwork after August 27, describing the nature of his sickness or injury as "syncope, memory loss." (*Id.* ¶ 19–20; Burgess Decl. ¶ 19–20.) Plaintiff testified at his deposition that he did not necessarily request the STD leave, but did not have any objection to being placed on this paid leave, either. (Pl.'s Dep. at 43:7–12.)

Shelly Burgess, a licensed nurse and a Disability Case Manager employed by Defendant, approved Plaintiff's medical leave. (Burgess Decl. ¶ 2; Sandager Dep., Ex. 5 to Pl.'s Loc. R. 56(a)2 Stmt.  at 24:9–21.)  She did not understand syncope to be "a specific diagnosis or a medical condition in and of itself, but rather a symptom of many possible conditions" that "can have a variety of causes." (Burgess Decl. ¶ 22.)  Ms. Burgess explained that Ecolab granted Plaintiff's STD leave because the policy "requires only that an associate be medically certified as unable to perform his position."  (*Id.* ¶ 23.) Plaintiff's physician, Dr. David Shiling certified that Plaintiff was "able to work," but because he could not drive or engage in "any other activity where if a spell were to occur, [patient] would injure himself or others," the doctor only allowed him to perform "sedentary work." (Attending Physician's Statement of Disability, Ex. C–5 to Def.'s Loc. R. 56(a)1 Stmt.) Because driving was a "principal duty" or "essential function" of Plaintiff's position as an RSM and Plaintiff could

not perform that function, he qualified for the STD benefits. (Panas Decl., Def.'s Ex. A ¶ 7; Ecolab STD Policy at ECO0427; Burgess Decl. ¶ 23.)   Thus, Plaintiff was placed on short–term disability leave, retroactively to July 22, 2008. (Sandager Decl. ¶ 21; Sept. 12, 2008 Sandager Letter to Plaintiff, Ex. B–5 to Def.'s Loc. R. 56(a)1 Stmt.)

Until the end of 2008, while Plaintiff was on leave, a route manager–in–training, Justin Santillo, covered Plaintiff's position, assisted by other route managers. (Hainey Dep. at 72:7–10, 76:5–13, 76:25–77:3.) Mr. Hainey covered Plaintiff's route for a few weeks or a month, as well. (*Id.* at 72:6–7.) As a result, customers were adequately taken care of and did not complain. (*Id.* at 76:14–17.) Santillo did not continue covering or permanently take over Plaintiff's position after the end of 2008, presumably because he lived in Framingham, MA, and the commute to the position was too long. (*Id.* at 72:12–20.)

From July to December 2008, Plaintiff remained in touch with Mr. Hainey and told him that he wanted to return to work, or that he was feeling better, but could not show that he was medically able to return. (Pl.'s Dep. at 48:6–7, 49:3–15, 52:22, 53:4–12.) Plaintiff's cardiologist performed an "extensive cardiac evaluation" including a coronary angiogram, a transesophageal echocardiogram, and Holter monitoring; results from all of these tests turned out to be largely normal and no causes of the syncope or memory loss were identified. (Jan. 7, 2009 Letter from Dr. Fucci, Ex. C–9 to Def.'s Loc. R. 56(a)1 Stmt. at P157.)[1] During the course of Plaintiff's medical leave, he had no medical explanation for what was causing his symptoms. (Hainey Dep.  at 63:14–17, 64:8–13.)

---

[1]  At oral argument, Defendant's counsel  represented that Defendant was never made aware of Plaintiff's Holter monitor, however, Ms. Burgess testified during her deposition that she had been notified by telephone that Plaintiff was undergoing tests, including a heart monitor.  (*See* Burgess Dep. 79:13–80:18.)

Mr. Hainey told Plaintiff that he wanted him back to work, and that Plaintiff should find another doctor, if necessary, to get a diagnosis on what exactly was wrong with him (*id.* at 63:23, 84:3–5), and also suggested that Plaintiff refrain from his excessive consumption of Mountain Dew (five or ten daily). (*Id.* at 64:1–4.) At one point, Plaintiff told Ms. Burgess that he had diabetes, which Mr. Hainey had also suspected (Burgess Dep., Ex. 4 to Pl.'s Loc. R. 56(a)2 Stmt.  at 68:12–15, 78:24–79:5; Hainey Dep. at 63:24–64:2), but no doctor ever opined that the diabetes caused the syncope and memory loss. (Burgess Decl. ¶ 52.)

In December 2008, Plaintiff was treated for stress–related chest pains (Pl.'s Aff. ¶ 4), and Dr. Fucci, Plaintiff's cardiologist, placed him on a heart monitor for thirty days. (Pl.'s Dep. at 48:6–7, 49:3–15.) Plaintiff expected that his doctor would clear him for work at the end of the thirty–day period if nothing happened during that time. (*Id.* at 91:13–18, 95:21–25.) On December 3 and December 5, 2008, Plaintiff relayed this information to Mr. Hainey and Ms. Burgess. (*Id.* at 91:13–16; Pl.'s Aff. ¶ 10.)

Mr. Hainey's understanding from Plaintiff's communication was that his doctor wanted Plaintiff to wear the monitor for thirty days "before [the doctor] would even consider saying [Plaintiff] could drive again." (Hainey Dep. at 66:18–21.) Ms. Burgess also stated that although Plaintiff told her about the heart monitor, at that time (December 2008) he was still describing himself as having problems with physical activity. (Burgess Dep. at 69:22–70:1.) Defendant did not consider that information as providing an exact return date. (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 9–10; Hainey Dep. at 89:20–25.)

Plaintiff's job–protected FMLA leave expired around October 14, 2008. (Burgess Decl. ¶ 29.) By December 2008, Mr. Panas and Mr. Hainey both wanted Plaintiff to return to work (Hainey Dep. at 83:22–84:7; Panas Decl. ¶ 18), but began discussing plans for

Plaintiff's route in case he could not return (Panas Decl. ¶ 15; Hainey Dep. at 104:23–105:3), because Mr. Hainey "was working way too much for six months . . . [and could not] go on like that" (Hainey Dep. at 103:5–7), and "if customers don't see a consistent guy coming in every month, [Ecolab] could lose business," particularly during the economic downturn (*id.* at 103:8–10). Panas was similarly concerned that "Mr. Hainey and other RSMs who were covering Plaintiff's route were overextended and that the needs of the business were not being met" (Panas Decl. ¶¶ 15–17), concerns which Ms. Sandager echoed. (Sandager Decl. ¶ 24.) Having the RSM–in–training cover Plaintiff's route was not seen as a permanent solution. (*Id.* ¶¶ 17, 19.)

Despite the desire to have Plaintiff return to work, Mr. Hainey explained that there was much uncertainty surrounding Plaintiff's situation throughout Plaintiff's leave—Plaintiff could not give him a return date or a concrete diagnosis. (Hainey Dep. at 83:25–84:5.) Although Plaintiff told Mr. Hainey and Ms. Burgess that he expected that he would be cleared for work at the end of the thirty–day period, neither Mr. Hainey nor Ms. Burgess construed the heart monitoring as meaning that Plaintiff could return to work soon. (Hainey Dep. at 89:20–25.) Mr. Hainey informed Ms. Sandager and Mr. Panas that there was still the possibility that they would find out something about Plaintiff's situation after the thirty–day period was over, so the management team still "didn't know what the 30 days would do" (*id.*), particularly because Plaintiff told Ms. Burgess in December that he was still having problems.  Ecolab received a note dated December 4, 2008 from Dr. Shiling reiterating that Plaintiff was not allowed to drive "until cleared by cardiologist and PCP [Primary Care Physician]" (Note from Dr. Shiling, Ex. C–8 to Def.'s Loc. R. 56(a)1 Stmt.), and they learned in early January that Plaintiff had had another episode of dizziness and

shortness of breath on December 16. (Jan. 7 Letter from Dr. Fucci at P157; Burgess Decl. ¶ 42.)

Defendant claims that this uncertainty about when Plaintiff could return caused management to decide to seek a replacement for Plaintiff's route. (Panas Dep., Ex. 6 to Pl.'s Loc. R. 56(a)2 Stmt. at 35:9–10; Hainey Dep. at 89:11–15; Sandager Dep., Ex. I to Def.'s Loc. R. 56(a)1 Stmt. at 26:6–14.) Plaintiff received a letter stating that "[a]t this point, it is unknown how long you will be on a leave" and that "Ecolab will now begin to recruit for this position." (Dec. 17, 2008 Letter to Plaintiff, Ex. B–4 to Def.'s Loc. R. 56(a)1 Stmt.) Plaintiff does not claim that he contacted Sandager or others at Ecolab to protest the decision or correct the substance of the letter, even in his communication with Ms. Burgess when he Plaintiff continued to complain of dizziness not knowing what was causing his symptoms. (Sandager Decl. ¶ 28.) Although Plaintiff was still saying that he hoped to obtain clearance to return to work sometime in late December 2008 or early January 2009 (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 8), Defendant began to look for a replacement for Plaintiff after the December 17, 2008 letter. (Sandager Dep. at 31:1–6; Panas Dep. at 62:6–8.) After learning that Plaintiff's position had opened up, Ken Wittington Jr., the son of a district manager for Defendant, asked if he could take it.[2] (Hainey Dep., at 85:25–86:5; Panas

_____

[2] In its response to Plaintiff's interrogatories, Defendant stated that "Ms. Sandager was able to identify an internal candidate who was suitable for the job." (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 10.) Ms. Sandager, however, denied that she was the one who identified the internal candidate. (Sandager Dep. at 36:8–12.) Though Mr. Panas claimed that he identified Wittington as the replacement in his affidavit, (Panas Decl. ¶ 22,) he implied that Wittington "assigned himself" to that position, and said that he "couldn't recall" who had identified Wittington as a replacement. (Panas Dep. at 59:3–6, 59:20–21.)

Defendant also stated, in its response to the interrogatories, that at the time of the December 17, 2008 letter, "an internal candidate was identified who would be able to assume

Dep. at 59:4–9.) How Mr. Wittington came to be internally transferred to Plaintiff's position is unclear (Panas Dep. at 59:18–21), but the approval was based on his being an employee in good standing who actively sought the transfer, and during this time, Defendant remained uncertain about Plaintiff's ability to return to work.  (Panas Dep. at 59:4–9; Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 10; Panas Decl. ¶ 22.)  Mr. Wittington took on Plaintiff's position around January 14, 2009. (Panas Decl. ¶¶ 25–26.)

Mr. Hainey admitted that a decision regarding Plaintiff's position could have been made at the end of the STD period (Hainey Dep. at 90:1–6), and if the decision to fill the position were up to him, he would have waited to hire Plaintiff back. (*Id.* at 95:1–6, 103:15–21.)

In early January 2009, Plaintiff was released to return to work, still without a medical explanation for his symptoms. (*See* Burgess Decl. ¶¶ 46–47.) Plaintiff's cardiologist's January 7, 2009 letter stated that he could not "find any significant cardiac cause for [Plaintiff's] symptoms of dizziness and lightheadedness or . . . dyspnea" (Jan. 7, 2009 Letter from Dr. Fucci at P158), and saw "no obvious cardiac illnesses that would prohibit [Plaintiff] from safely performing his work duties." (*Id.* at P159.)   In compliance with Defendant's requirement that all his primary care providers certify his ability to return to work (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 9), on January 13, 2009, Plaintiff's general

---

[Plaintiff's] position on a regular basis effective January 2009." (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 9.) On the other hand, Sandager stated that no recruiting had been done to fill Plaintiff's position prior to December 17, 2008. (Sandager Dep. at 30:24–31:6.) The letter itself also states that "Ecolab will now begin recruit for a placement for your position." (Dec. 17, 2008 Letter to Plaintiff, Def.'s Ex. B–4.) However, there does not seem to be anything from the records contradicting Panas's statement that Wittington's transfer was confirmed in late December. (Panas Decl. ¶ 25.)

practitioner, Dr. Coppotelli, wrote to clear Plaintiff for work without any restrictions. (Note from Dr. Coppotelli, Ex. C–10 to Def.'s Loc. R. 56(a)1 Stmt.)

Learning that he was released to return to work, Plaintiff immediately called Mr. Hainey on January 8, 2009 and on January 14 faxed Defendant the medical notes and reports clearing him to return to work. (Pl.'s Aff. ¶ 11.) However, since Plaintiff's position was now filled, Ms. Sandager advised Plaintiff to look for another job within Ecolab, even though she did not know when Plaintiff's position was filled, or by whom. (Sandager Decl. ¶ 3; Sandager Dep. at 36:21–23.)

As part of Defendant's regular procedure, Plaintiff was given thirty days to find another position with Defendant before his employment would be terminated on February 23, 2009. (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 13.) Plaintiff located a pest elimination position, as well as another position in Connecticut. (Pl.'s Dep. at 109:7–10). Ms. Sandager informed Plaintiff that the pest elimination position was filled internally, and Plaintiff was not given the other position he located. (*Id.* at 108:15–18, 109:18–20.)

Ms. Sandager also inquired about potential positions for Plaintiff, including a Service Specialist position and a Distributor Specialist position, both in Connecticut; neither was available. (Sandager Decl. ¶¶ 43–44.) The Distributor Specialist position was open but "on hold" when Mr. Sandager inquired about it, thus no offer could be extended at that time. (Sandager Emails, Ex. B–7 to Def.'s Loc. R. 56(a)1 Stmt.) The position was never filled and the posting was closed. (Sandager Decl. ¶ 44.) The Service Specialist position was internally filled when Ms. Sandager inquired. (Sandager Emails.)

Ms. Sandager avers that she informed Plaintiff on Feburary 18, 2009 about an opening in White Plains, NY, but claims that Plaintiff rejected that position because of

distance from his home.[3] (Sandager Decl. ¶ 45.)  Plaintiff denies that he rejected the position, saying that he did not recall hearing anything about the White Plains position (Pl.'s Dep. at 114:21–24.) and that he would have commuted to that job (*id.* at 114:7–11), although he also limited the commute time he was willing to drive to under two hours each way (*id.* at 115:19–23).

Since Defendant underwent a reduction in workforce at that time (Sandager Decl. ¶ 47), no other positions appeared to open up in the region where Plaintiff worked. (Def.'s Apr. 19, 2010 Resp. to Pl.'s First Interrogs. at 11.)  Subsequently, Plaintiff considered the severance package that Ecolab offers to displaced employee but turned it down after reviewing it. (Sandager Decl. ¶¶ 48–49.) Plaintiff's employment was formally terminated on March 6, 2009. (Mar. 5, 2009 Sandager Letter to Plaintiff, Ex. B–9 to Def.'s Loc. R. 56(a)1 Stmt.)

---

[3] The email record between Sandager and Sedar Jones, another Human Resources staff member, shows that Sandager did 1) inquire about the position and 2) inform Jones subsequently that "the associate [presumably referring to Plaintiff] . . . feels the territory is too far from his home." (Sandager Emails.)

II.    Discussion[4]

To establish a *prima facie* case of disability discrimination under the ADA or the ADA Amendment Act of 2008, Plaintiff must show that (1) he was a person with a disability within the meaning of the statute; (2) Defendant Ecolab had notice of his disability; (3) he could perform the essential functions of the job with reasonable accommodation; and (4) Ecolab refused to make such accommodation. *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000). If the plaintiff succeeds on the first three elements of his or her claim, a failure to make reasonable accommodation amounts to a discharge "because of" plaintiff's disability. *Id.* (Citing *Ryan Grae & Rybicki, P.C.,* 135 F.3d 867, 870 (2d Cir. 1998)). If Plaintiff establishes the *prima facie* case, the burden shifts to the Defendant to show that the accommodation would result in undue hardship. *Parker*, 204 F.3d at 332.

However, prior to addressing the evidentiary adequacy of Plaintiff's *prima facie* case, because the circumstances at issue evolved over many months between 2008 and 2009, there is a threshold issue of whether the original Americans with Disabilities Act, 42 U.S.C. § 12102 *et seq.*, applies to Mr. Hutchinson's case, or whether the ADA Amendment Act of

---

[4] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

2008 ("ADAAA"), effective as of January 1, 2009,  governs the analysis.[5]  The ADAAA "substantially broadened the definition of a 'disability' under the law," in explicit response to *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mftrg. v. Williams*, 534 U.S. 184 (2002), in which the ADA's terms defining "disability" had been strictly defined. Plaintiff's counsel acknowledged at oral argument that Plaintiff cannot prevail under the ADA definition of disability, and thus whether or not the ADAAA applies is a critical determination.

This turns on whether Plaintiff suffered the "adverse employment action" he claims before or after January 1, 2009, the effective date of the ADAAA.  "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006). Defendant asserts that "the action complained of here, the decision to replace Plaintiff based on his inability to provide a return to work date, occurred in December 2008."  (Mem. Supp. [Doc. #53] at 19 n.16.)  Plaintiff, on the other hand, argues that the ADAAA applies because "Defendant failed [to] accommodate Plaintiff by (1) its refusal to reinstate him to his position after he returned from a short term disability leave, despite his request that

---

[5]  Section 8 of the ADAAA provides, "[t]his Act and the amendments made by this Act shall become effective on Jan. 1, 2009." Pub. L. 110–325, 122 Stat. 3553, 3559 (2008). Both parties agree that the ADAAA is not retroactive.

Defendant do so . . . when Plaintiff informed Defendant of his clearance to return to work [after January 1, 2009] . . , and (2) by its failure to transfer Plaintiff to an open position following that date." (Opp'n [Doc. # 65] at 15.)  Because it is undisputed that Plaintiff lost his employment with Defendant in January 2009, whether by refusal to reinstate him to his RSM position or to transfer him to an open position, the Court agrees with Plaintiff that the adverse action alleged, i.e., Ecolab's failure to provide Plaintiff with a reasonable accommodation, occurred after January 1, 2009 and therefore the ADAAA applies.

A.      Whether Plaintiff Was "Disabled"

1.      Under the ADAAA

The ADA, as amended by the ADAAA, makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges or employment."  42 U.S.C. § 12112(a).

Under the ADAAA, the definition of "disability" is construed in "favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."  42 U.S.C. § 12102(4)(A).  The Act defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individuals; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  *Id.* § 12102(1).[6]  The ADAAA expanded the interpretation of the ADA's

---

[6] Proposed regulations implementing the ADAAA were published by the EEOC in September 2009, after the alleged discrimination and thus have no binding effect in this case, but are useful in understanding the intended meaning of the Amendments.  *See Hoffman v. Carefirst of Fort Wayne, Inc.*, 737 F. Supp. 3d 976, 976 n.1 (N.D. Ind. 2010) (the EEOC's interpretation of the ADAAA is "another tool to glean the intended meaning of the [Act]," in spite of the fact that the alleged discrimination occurred in January 2009, and before the EEOC proposed regulations were published).  These EEOC regulations define, "physical or mental impairment" as including "any physiological disorder, or condition . . . or anatomical

three–category definition of "disability."  For example, "major life activity" includes "caring for oneself, performing manual tasks . . . walking, standing, lifting, bending, speaking, breathing . . , and working," as well as  "the operation of a major bodily function," including "neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  Pub. L. No. 110–325, 122 Stat. 3553, 3555 (2008).

Here, the record shows the onset of Plaintiff's symptoms on July 22, 2008 and his inability to perform work requiring driving confirmed by doctor's notes, dated July 22 and July 31, 2008.  (*See* Ex. E–1 to Def.'s Loc. R. 56(a)1 Stmt.)  Thereafter, on September 2, 2008, neurologist Dr. Shiling characterized Plaintiff's symptoms as "syncope and memory loss" (Ex. C–5 to Def.'s Loc. R. 56(a)1 Stmt.),[7] resulting in a physical impairment of "Class 4," that is, "Moderate limitation of functional capacity; capable of clerical/administrative (Sedentary) activity," but "[patient] cannot drive or climb ladders or any other activity where if a spell were to occur [patient] would injure himself or others."  (*Id.*)

---

loss affecting one or more of the following body systems: neurological, musculoskeletal . . . cardiovascular."  29 C.F.R. 1630.2.

[7] The American Heart Association ("AHA") defines syncope as a "temporary loss of consciousness and posture, described as 'fainting' or 'passing out.'  It's usually related to temporary insufficient blood flow to the brain."  Syncope "most often occurs when the blood pressure is too low (hypotension) and the heart doesn't pump a normal supply of oxygen to the brain."  Causes include "emotional stress, pain, pooling of blood in the legs due to sudden changes in body position, overheating, dehydration, heavy sweating or exhaustion."  Also, "[s]yncope may occur during violent coughing spells . . . because of rapid changes in blood pressure.  It also may result from several heart, neurologic, psychiatric, metabolic and lung disorders.  And it may be a side effect of some medicines."  "Syncope," American Heart Ass'n.,  http://www.americanheart.org/HEARTORG/Conditions/Arrhythmia/Symptoms DiagnosisMonitoringofArrhythmia/Syncope_UCM_430006_Article.jsp.  Though the AHA notes that a "neurally mediated syncope" is a "benign" and frequent cause of fainting, the AHA also cautions that "life–threatening conditions may also manifest as syncope."  *Id.*

It is undisputed that Plaintiff was prevented from performing *any* job that required driving, although he could perform "clerical/administrative" work. The Supreme Court in *Sutton* emphasized that the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of "working," and the petitioners "allege[d] only that respondent regards their poor vision as precluding them from holding positions as a "global airline pilot," which is merely "a single job," and "there are a number of other positions utilizing petitioners' skills, such as regional pilot and pilot instructor . . . that are available to them." 527 U.S. at 493. Under this reasoning, inability to perform any job requiring driving could constitute a "broad class of jobs," rather than the "single job" that Plaintiff was substantially limited from performing.

The Second Circuit has not decided the question of whether job which require driving as an essential job function could constitute a sufficiently "broad range or class of jobs."[8] *See EEOC v. J.B. Hunt Transport, Inc.*, 321 F.3d 69, 75 (2d Cir. 2003) ("the [plaintiffs'] perceived unsuitability for the position of [driving sleeper trucks] cannot be characterized as a perceived inability to perform a broad range or a class of jobs. This is true even assuming that truck–driving in general is a sufficiently broad range or class of jobs to

---

[8] In his single–minded focus on his work as a Route Sales Manager, Plaintiff testified that he was prevented from working in the specific position of a Route Sales Manager, or from that particular type of service job that required driving. (Opp'n at 19–20; Pl.'s Dep. 10:9–10, 21:4–7.)

constitute a "major life activity," an issue we do not need to reach.").[9]   The Court concludes that the record supports Plaintiff's claim of substantial limitation from performing the major life activity of working, that is, from performing any job that requires driving.

The Court therefore concludes that there is sufficient evidence from which reasonable jurors could conclude that Plaintiff was disabled within the meaning of the ADAAA.   Because Defendant had notice that  Plaintiff's medical condition disabled him from the job functions of driving,[10] the first two elements of his *prima facie* case are satisfied.

---

[9]  Courts in the past have held that syncope did not substantially limit a person's ability to engage in a major life activity of working by preventing him/her from being a heavy commercial truck driver; driving such vehicles, especially when over a long distance, could not be considered as a broad class of jobs. *EEOC v. Schneider Nat'l, Inc.*, 481 F.3d 507, 511 (7th Cir. 2007); *EEOC v. J.B. Hunt Transp., Inc.*, 321 F.3d 69, 75 (2d Cir. 2003). However, all of these decisions were rendered under a narrow interpretation of the ADA that has since been rejected by the ADAAA.

 The appendix to the final EEOC regulations note that "the terms 'class of jobs' and 'broad range of jobs in various classes' will [now] be applied in a more straightforward and simple manner than they were applied by the courts prior to the Amendments Act," and provides several examples of what could constitute a "broad range of jobs," including "commercial truck driving, assembly line jobs, food service jobs, clerical jobs, or law enforcement jobs" and "jobs requiring repetitive bending, reaching, or manual tasks, jobs requiring repetitive or heavy lifting, prolonged sitting or standing, extensive walking, driving, or working under conditions such as high temperatures or noise levels." Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, as Amended, 76 Fed. Reg. 16978–01, *17013, 29 C.F.R. Part 1630 (Mar. 25, 2011).

[10] Defendant argues that "Ecolab certainly had no reason to believe that Plaintiff was a qualified individual with a disability during the timeframe at issue (or thereafter)"  (Mem. Supp. at 22), despite its notice of Plaintiff's syncope (*see, e.g.*, Ex. C–1 to Def.'s Loc. R. 56(a)1 Stmt.), because Plaintiff "had no idea what was causing his symptoms." (Mem. Supp. at 22.) However, the ADAAA does not require a plaintiff to have a formal "diagnosis" in order to be "disabled"—an impairment that substantially limits a major life activity is all that is required.

2.	*Under the CFEPA*

The CFEPA definition of physical disability is broader than the ADA or the ADAAA, because it covers "chronic" impairments even if not permanent.[11]  *See Caruso v. Siemens Business Systs., Inc.*, 56 Fed. Appx. 536, 2003 WL 174791, *1 (2d Cir. Jan. 23, 2003).  It does not require proof that the impairment substantially limits one or more major life activities, as required under the ADAAAA.  *Beason v. United Technologies Corp.*, 337 F.3d 271, 275 (2d Cir. 2003).

Here, Plaintiff's medical condition prevented him from working in any position requiring driving for nearly six months.  As CFEPA defines "impairment" for the purposes of its definition of "disability" broadly, there is sufficient evidence in the record for a reasonable jury to conclude that Plaintiff was also disabled under CFEPA.[12]

---

[11] CFEPA defines "disability" as "any chronic physical handicap, infirmity, or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness."  Conn. Gen. Stat. § 46a-51(15). Although CFEPA does not define the term "chronic," courts have interpreted it to mean "of long duration, or characterized by slowly progressive symptoms; deep–seated or obstinate, or threatening a long continuance; distinguished from acute."  *Shaw v. Greenwich Anesthesiology Assocs.*, No. 3:99cv1076(PCD), 137 F. Supp. 2d 48, 65 (D. Conn. April 5, 2001), abrogated on other grounds by *Beason v. United Technologies Corp.*, 337 F.3d 271, 281 (2d Cir. 2003).

An impairment lasting a single month has qualified as a disability under CFEPA.  *See, e.g.*, *Gilman Bros. Co. v. Comm'n Human rights & Opportunities*, No. CV950536075, 1997 WL 275578, *4–5 (Conn. Super. May 13, 1997) (the plaintiff's tendinitis and/or carpal tunnel syndrome, which plaintiff had for only one month prior to employer's adverse action, was a "chronic" handicap under CFEPA).  Further, the Connecticut Supreme Court found that a plaintiff suffering from hypertension, and who had to take a two–week leave of absence as a result of high blood pressure was disabled under CFEPA.  *Adriani v. Comm'n on Human Rights & Opportunities*, 220 Conn. 307, 314 n.7 (1991).

[12] In *Curry v. Allan S. Goodman, Inc.*, 2004 WL 3048590 (Conn. Super. 2004), the Connecticut Superior Court agreed with the District of Connecticut that "CFEPA has also been interpreted to require an employer to reasonably accommodate disabled employees,"

B.      Whether Plaintiff Could Perform the Essential Functions of his Job with
        Reasonable Accommodation

The ADA "envisions an interactive process by which employers and employees work
together to assess whether an employee's disability can be reasonably accommodated."
*Jackan v. New York State Dep't of Labor*, 205 F.3d 563, 566 (2d Cir.), *cert. denied,* 516 U.S.
931 (2000).  The plaintiff bears the initial burden of proving that an accommodation exists
that would permit her to perform the essential job functions, after which the burden shifts
to the employer to demonstrate that the accommodation is not reasonable. *Id.*

Liability for a failure to accommodate claim requires proof that an employee is
"otherwise qualified" for his position, *see* 42 U.S.C. §§ 12112(a), 12112(b)(5)(A); *McBride
v. BIC*, 583 F.3d 92, 96, 101 (2d Cir. 2009).  Defendant argues that because of his syncope
Plaintiff was not a qualified individual with a disability because he was "unable to perform
the essential functions of his RSM position at the time Ecolab hired a replacement." (Mem.
Supp. at 25.)  However, Plaintiff sought as accommodation sufficient leave to regain control
of his symptoms and then reinstatement.  A medical leave of absence is a recognized form
of accommodation and its reasonableness is a question of fact for a jury.  *See Criado v. IBM
Corp.*, 145 F.3d 437, 444 (1st Cir. 1998) (holding that whether plaintiff's leave request was
a reasonable accommodation was a question for the jury); *Kimbro v. Atlantic Richfield Co.*,
889 F.2d 869, 878–79 (9th Cir. 1989) (finding that an employee who suffered from acute
migraine headaches was justified in requesting a temporary leave of absence as an

---

*Hill v. Pfizer*, No. 3:01cv1546(GLG), 266 F. Supp. 2d 352, 364 (D. Conn. June 3, 2003).
Accordingly, the same reasonable accommodation analysis is used for both CFEPA and
ADA claims.

19

accommodation for his disability where the leave would have allowed his doctor to formulate an effective treatment); *Cousins v. Howell Corp.*, No. 3:98cv1945(GLG), 113 F. Supp. 2d 262, 270–71 (D. Conn. Sept. 22, 2000) (noting that providing medical leave has been held to be a reasonable accommodation under the ADA).  The EEOC Enforcement Guidance has found that "permitting the use of accrued paid leave, or unpaid leave, is a form of reasonable accommodation when necessitated by an employee's disability."  *See* 29 C.F.R. pt. 1630 app. § 1630.2(o).  For the purposes of a *prima facie* showing, the plaintiff must merely "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995).  Here, although the precise date on which the requested leave would conclude was not known until January, it would not exceed six months, as Defendant's counsel acknowledged at oral argument. Defendant does not claim that this leave would have presented an undue hardship, as corroborated by Mr. Hainey's statement that, if it were up to him, he would have waited.  Defendant maintains that Plaintiff's requested accommodation was to indefinitely hold open his position, which would not be a "reasonable accommodation." (*Id.* at 28–29.)  Given the dispute of fact as to what the requested accommodation was, and whether the lack of specificity made the accommodation request unreasonable, this issue must remain for jury determination.

There is sufficient evidence from which a reasonable jury could conclude that between July 2008, when Plaintiff's short–term leave began,  and January 13, 2009, when Plaintiff was cleared to return to work, Plaintiff was qualified for his position with a reasonable accommodation in the form of a medical leave of absence.

C.      Whether Defendant Failed to Make Such Accommodation

Defendant received notice on January 7, 2009 that Plaintiff's cardiologist had fully cleared him to return to work, and Plaintiff was cleared to return to work without restriction by his general practitioner on January 13, 2009, in full compliance with Defendant's clearance requirements.  Neither George Panas or Jim Hainey, Plaintiff's direct supervisors, nor Rochelle Burgess, the Disability Case Manager for Ecolab, nor Andrea Sandager, the Human Resources Representative, take responsibility for having made the decision to select Ken Wittington, Jr. to replace Plaintiff, though each person was copied on the December 17, 2008 letter notifying Plaintiff that Ecolab was to "begin the process of looking for a replacement for [his] position."  The letter was unsigned, and Mr. Hainey denies writing the letter.  Further, the only evidence Defendant provides of when Mr. Wittington assumed Plaintiff's RSM position is "on or about January 14, 2009."  (Panas Aff. ¶ 26.)  The record shows that Plaintiff was fully released to work as early as January 7, 2009, and finally by January 13, 2009, that Plaintiff immediately notified Mr. Hainey of this news (Pl.'s Aff. ¶ 11), and that Jim Hainey "would have hired Tom back in a second."  (Hainey Dep.  at 95:1–2.)  However, Defendant did not allow Plaintiff to return to work and instead wrote to Plaintiff on January 23, 2009 that "[u]nfortunately, at this time we do not have a Route Sales Manager position available for [him]."  (Jan. 23, 2009 Ltr. Regarding Release to Work.)

Because Defendant has not shown beyond dispute that the Plaintiff was actually replaced before Plaintiff was cleared to return to work, or that it was unreasonable to hold the RSM position open longer, there exists a genuine dispute as to whether Defendant failed to provide Plaintiff with a reasonable accommodation in the form of leave and reinstatement.

III.     Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment [Doc. # 52] is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of September, 2011.